UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
) No. 05 CR 254
v. )
) Magistrate Judge Arlander Keys
AMIR HOSSEINI, et al. )

## MEMORANDUM OPINION AND ORDER

On April 12, 2005, this Court Ordered, pursuant to 18 U.S.C. §3142, that Amir Hosseini be detained at the Metropolitan Correctional Center pending trial or other resolution of this matter. The Court did so because it concluded, based upon the evidence and arguments put forth at a detention hearing held shortly after Mr. Hosseini's arrest, that Mr. Hosseini "has the means and the motive to flee the jurisdiction, and so is a risk of flight." *See* Order of Detention Pending Trial, p. 6 (April 12, 2005). Mr. Hosseini has now asked the Court to reconsider that position and to release him on bail. For the reasons explained below, the Court grants Mr. Hosseini's motion.

### Background

On March 21, 2005, Amir Hosseini was arrested in connection with a criminal complaint alleging that he conducted and participated in a racketeering conspiracy in violation of 18 U.S.C. §1962(d). Specifically, the complaint alleges that Mr. Hosseini directed and committed various criminal predicate acts including money laundering, in violation of 18 U.S.C. §1956;

engaging in and attempting to engage in monetary transactions in criminally derived property valued at more than $10,000, in violation of 18 U.S.C. §1957; mail fraud, in violation of 18 U.S.C. §1341; bank fraud, in violation of 18 U.S.C. §1344; and structuring monetary transactions to evade reporting requirements, in violation of 31 U.S.C. §§5324 and 5322(b). The government alleges in its complaint that, from 1995 to the time of the complaint, Mr. Hosseini, who owned and operated a car dealership located at 3356 West North Avenue, and had an ownership interest in two other car dealerships, helped gang members and drug dealers launder their money by selling them high-end cars for cash at that dealership, and that he did so without reporting the cash transactions to the IRS, and in a manner that was calculated to disguise the true nature of the transactions. The government alleges that, in total, Mr. Hosseini and his co-defendants "laundered over $9 million for Chicago's street gangs and international drug traffickers." Government's Response to Hosseini's Motion to Reconsider Release on Bail, p. 2. According to the government, Mr. Hosseini faces a maximum twenty-year sentence if convicted on the conduct charged in the complaint.[1]

---

[1] The government's complaint also includes a second count, alleging that one of Mr. Hosseini's co-defendants, Hossein Obaei, knowingly aided, abetted, and facilitated an ongoing drug trafficking conspiracy to knowingly and intentionally possess with intent to distribute and to distribute cocaine and heroine in violation of 21 U.S.C. §846 and 18 U.S.C. §2. Mr. Hosseini is not named in Count Two,

2

On March 25, 2005, the Court held a detention hearing; Mr. Hosseini was present and was represented by Elliot Samuels. The government indicated that it was seeking detention for Mr. Hosseini, and, as part of its proffer, it called to the stand Lynsey Roever, who works as a uniformed officer for Customs and Border Protection at O'Hare airport. Ms. Roever testified that, based upon information she received from the FBI, on February 8, 2005, she met Mr. Hosseini at the airport when he got off a flight from Germany, and she escorted him to the immigration booth, where she questioned him and searched his luggage. She testified that, during her encounter with Mr. Hosseini, she asked him if he had any other passports, and he said that he did not. Transcript of Proceedings of March 25, 2005, p. 50 (attached as Exhibit A to the Government's Response to Hosseini's Motion to Reconsider Release on Bail). She further testified that she later repeated her question about whether he had any other passports and, that time, Mr. Hosseini pulled out an Iranian passport and gave it to her. *Id.*, p. 52.

On cross-examination, Ms. Roever admitted that she did not know whether a person – including a United States citizen – would need an Iranian passport to go to Iran; she also testified that Mr. Hosseini was cooperative throughout his encounter with her,

_____

and, at least as of this time, there have been no drug-related charges leveled against him.

that he freely provided his address, business information, his reason for traveling to Iran, etc. *Id.*, p. 57.

With respect to the passport issue, the government emphasized that, in its view, Mr. Hosseini lied about having an Iranian passport, and that he did so because he wanted to conceal the fact that he had been traveling to Iran at least twice a year, all of which suggests that he is a flight risk. Transcript of Proceedings of March 25, 2005, pp. 60-61. The government also noted that, at least according to the stamps in his passports, Mr. Hosseini had traveled to Switzerland, Mexico, Saudi Arabia, Italy, Germany, Amsterdam, the United Arab Emirates, Bahrain, and Canada, which, according to the government, "bare[s] out the fact that he is an international money launderer, as well as laundering all this drug money locally, as well as engaging in international narcotics trafficking . . . ." Transcript of Proceedings of March 25, 2005, pp. 66-67.

In response to the government's proffer, Mr. Hosseini called to the stand FBI Agent Robert Walker, the agent who signed the complaint and whose sworn affidavit is attached to the complaint. On direct questioning from Mr. Hosseini's counsel, Agent Walker admitted that most of the people he interviewed in connection with his investigation of Mr. Hosseini and the dealerships with which he is involved were "unsavory," that most hoped to gain something from the government in return for their cooperation.

4

Transcript of Proceedings of March 25, 2005, pp. 76-78. On cross-examination by the government, Agent Walker then spelled out in detail his understanding of Mr. Hosseini's role in the enterprise alleged in the complaint; he testified that, in his interviews with various people, he heard that Mr. Hosseini "is involved in the importation and distribution of both heroin and cocaine, and he also launders money by allowing the drug dealers to purchase cars there with cash, which he hides through using straw buyers as the recipient purchaser on the sales contract and not reporting the IRS Form 8300s properly." *Id.*, p. 79. He further testified that, according to CW-1,[2] Mr. Hosseini:

> helped set up the supply line for the heroin with the individuals in Iran. He stored the drugs, at least portions of the drugs on his car lot. He distributed the drugs through cars on his lot, which is consistent with what I have heard from other drug dealers who purchased from him.

*Id.*, p. 86.

Based upon this proffer, including the testimony of Agent Walker, the AUSA argued

> I can't think of any combination of conditions that you could fashion that would ameliorate the danger he presents to the community and the extreme risk of flight he poses.

> Quite frankly, I cannot think of a more compelling case on flight risk than has been presented before this Court today.

---

[2]A "cw" is a cooperating witness. CW-1 is serving a life sentence in prison. Transcript of proceedings of March 25, 2005, p. 97.

*Id.*, p. 92. In particular, the government noted that Mr. Hosseini has "not only the motive, but the means to flee, and extreme ties to foreign countries." *Id.* at 97. The government urged the Court to "look at the amount of foreign travel alone." *Id.*

In response, counsel for Mr. Hosseini argued that his client had been under investigation since 1996, and that, given his passports, if he had wanted to flee the jurisdiction, he could have done so; instead, he stayed, and even returned from a trip to Iran as recently as February 2005. Transcript of Proceedings of March 25, 2005, p. 94.

At the close of counsel's arguments, the Court found as follows:

> I think the the strength of the evidence is very – is very strong.
>
>               * * *
>
> I believe that Mr. Hosseini, who has passports from both Iran and the United States, and also his family has passports, which we could have them to turn in, but the frequent travel, the 20 to 45 trips abroad or stops abroad by Mr. Hosseini and most of which were in Iran, would indicate to the Court that the defendant, if released on bail, will have the means and the motive to flee the jurisdiction, so I'm going to hold him as a risk of flight.

Transcript of Proceedings of March 25, 2005, p. 100. On April 12, 2005, the Court issued an Order of Detention, which had been prepared by the government. As reflected in that Order, significant to the Court's decision to detain Mr. Hosseini were: the fact that Mr. Hosseini held a valid Iranian passport in

addition to his valid U.S. passport; the fact that Mr. Hosseini's passports revealed, in the Court's view, an extraordinarily high number of trips to Iran and other foreign countries – more specifically, the passports indicated that, during the period from about 1995 through 2005, Mr. Hosseini made 3 trips to Turkey, 29 trips to Iran, and 25 trips to other foreign countries. *See* Order of Detention Pending Trial, pp. 4-5 (April 12, 2005).

On May 6, 2005, Mr. Hosseini, through his counsel, filed a Motion to Reconsider Release on Bail. The government responded, and the Court held a hearing on the motion on June 14, 2005. Mr. Hosseini, who was present in Court and represented by counsel, did not put on any witnesses; nor did the government. Mr. Hosseini's attorney argued that, based upon what he had learned from certain State Department documents, the Court's decision to detain Mr. Hosseini was based upon faulty assumptions and should, therefore, be revisited. The government argued that nothing had changed since the Court's initial detention order, and that the Court should, therefore, decline to release Mr. Hosseini. The purpose of this Memorandum Opinion and Order is to set forth the Court's views of the information submitted in the briefs and at the hearing, as well as the Court's findings, conclusions and Order concerning the continued appropriateness of detention.

## Discussion

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Thus, the decision to detain an unconvicted person – who is still presumed to be innocent – should not be lightly made. Under the Bail Reform Act, a person facing charges in the federal court system may be detained only when a judicial officer has determined that "no other less drastic means can reasonably ensure his presence at trial," and "reasonably assure . . . the safety of any other person and the community . . . ." *See* 18 U.S.C. §3142(e); *Bell v. Wolfish*, 441 U.S. 520, 524 (1979).

Before turning to the merits of Mr. Hosseini's motion, the Court quickly considers – and rejects – the government's argument that the motion is improper. The government argues that the motion presents nothing new in the way of evidence or information, and that what it does present was available to Mr. Hosseini at the time of the first hearing. Section 3142(f) allows the court to reopen a detention hearing "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required . . . ." Mr. Hosseini's

briefs and arguments have provided the Court with additional information that gives context to the evidence presented by the government at the March 25th hearing; without casting aspersions, that information sheds a decidedly different light on the evidence presented by the government in support of its detention request. And, although the information may have been *available* at the time of the hearing, there is nothing in the record to suggest that counsel or Mr. Hosseini knew about it at the time of the first hearing, which is what the statute requires. Certainly, the importance of the information could not have been clear at that time, as counsel could have had no way of knowing that the government was going to fill the record with erroneous arguments concerning the impact of those pieces of evidence. The Court will not fault counsel for failing to uncover evidence necessary to clear up confusion that had not yet arisen and erroneous arguments that had not yet been made.

Turning to the merits of Mr. Hosseini's motion, the Court notes at the outset that, at this stage of the proceedings, the focus is "to determine whether there are conditions of release that can reasonably assure the appearance of a defendant at trial and, at the same time, preserve the safety of the community." *United States v. Warneke*, 199 F.3d 906, 908 (7th Cir. 1999); 18 U.S.C. § 3142(g). "The factors considered by the court in making these determinations center on risk of flight and danger, and not

on the determination of guilt and punishment." *Warneke*, 199 F.3d at 908.

To this end, the Bail Reform Act requires the government to prove, by a preponderance of the evidence, that no set of conditions exist that would reasonably assure the defendant's appearance at the required times. *See United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985). The statute directs that, in assessing the issue, the Court should consider:

the available information concerning–

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, or appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C.A. §3142(g)(West 2000 & Supp. 2005).[3]

The first, second and fourth factors require little discussion here. At this point, the sole charge against Mr. Hosseini involves violation of 18 U.S.C. §1962(d), the racketeering statute; although the complaint contains a count for narcotics distribution, Mr. Hosseini is not named in that count. Thus, although the charges against Mr. Hosseini are serious and troubling, they do not, under §3142(g)(1), necessarily weigh in favor of detention.

As for the second factor, based upon the testimony of Agent Walker, provided both in the affidavit attached to the complaint and at the initial detention hearing, the Court concluded that the evidence against Mr. Hosseini on the racketeering count was "very strong." Nothing in Mr. Hosseini's current submissions serves to alter that conclusion, and this factor still weighs in favor of detention. On the flip side, the Court previously concluded that the fourth factor weighs in favor of release; the

---

[3]The Act also creates certain presumptions to be employed by the Court, in particular cases, when assessing what, if any, release conditions might be appropriate. But, based on the offense with which the complaint charges Mr. Hosseini, those presumptions do not apply. The government has cited *United States v. Botero*, 604 F.Supp. 1028, 1033 (S.D. Fla. 1985), which holds, in part, that money laundering, one of the predicate acts alleged in the complaint, "is an integral part of the narcotics business" and therefore gives rise to the presumption that no combination of conditions exists to reasonably assure the appearance of the person as required. But the government has not cited, and this Court could not find, any case from this Circuit that holds similarly, and the Court is therefore unwilling to adopt such an expansive reading of the statute.

11

Court had, and has, no reason to think that Mr. Hosseini's release would pose any danger to anyone.[4]

The third factor requires a bit more discussion; indeed, resolution of the motion turns on this factor. As previously noted, in making the decision to detain Mr. Hosseini, the Court placed a fair amount of weight on the fact that Mr. Hosseini still carried an Iranian passport, despite having taken an oath, according to the government, that required him to renounce any allegiance to any country other than the United States; the Court also placed a fair amount of weight on the fact that Mr. Hosseini's passports reflected an extraordinarily high amount of travel abroad. Both of these pieces of evidence served to buttress, in the Court's view, the government's attempt to portray Mr. Hosseini as an international courier who could not be trusted to respect and obey Court orders. As it turns out, the Court may have placed too much emphasis on that evidence, and certainly was wrong about the impact of that evidence on the "flight risk" question.

At the detention hearing, the government offered evidence showing that Mr. Hosseini possessed a valid Iranian passport in addition to his valid U.S. passport. And the Court was given the

---

[4]Although it is true that "[d]rug offenders presumptively threaten the safety of the community," *United States v. Cervantes*, 951 F.2d 859, 861 (7th Cir. 1992), it is also true that Mr. Hosseini is not charged with any drug offenses.

impression that this fact alone was evidence of some kind of misconduct; that the mere simultaneous possession of the two passports suggested that something nefarious was, indeed, afoot, especially in light of the government's representation that the oath of citizenship for this country - which Mr. Hosseini signed - required him to "absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, of who, or which I have heretofore been a subject or citizen." *See* Oath of Renunciation and Allegiance, signed by Mr. Hosseini on October 15, 1996.

In his motion, and at the hearing on the motion, Mr. Hosseini presented documents from the State Department, which show that Mr. Hosseini's possession of the two passports was not only not nefarious, it was consistent with this country's official guidelines and policies. For example, one document issued by the United States Department of State defines "dual nationality" as meaning "that a person is a citizen of two countries at the same time"; although the document notes that the U.S. Government "does not encourage [dual nationality] as a matter of policy because of the problems it may cause," it in no way suggests that dual nationality somehow indicates dishonesty, wrongdoing or anything nefarious. *See* U.S. State Department Services Dual Nationality, May 4, 2005, *available at* http://travel.state.gov/travel/cis_pa_tw/cis/cis_1753.html

(attached as Exhibit C to Defendant Hosseini's Motion to Reconsider Release on Bail). Nor does the State Department condemn or otherwise impugn the holding of two, simultaneously valid passports for dual nationals. Indeed, the State Department recognizes that, in addition to requiring a U.S. passport to enter and leave the United States, dual nationals may also be required, by the other foreign country, to use its passport to enter and leave that country; the State Department specifically advises that "[u]se of the foreign passport does not endanger U.S. citizenship." *See* U.S. State Department Services Dual Nationality, May 4, 2005, *available at* http://travel.state.gov/travel/cis_pa_tw/cis/cis_1753.html (attached as Exhibit C to Defendant Hosseini's Motion to Reconsider Release on Bail).

Additionally, with specific reference to Iran, a Consular Information Sheet put out by the State Department's Bureau of Consular Affairs, warns that:

> U.S.-Iranian dual nationals have in the past been denied permission to enter/depart Iran documented as U.S. citizens, unless they have renounced their Iranian citizenship, and have had their U.S. passports confiscated upon arrival. Nevertheless, in recent years, the Iranian Government has become more lenient with dual nationals and rarely confiscates U.S. passports of U.S.-Iranian dual nationals. As a precaution, however, it is advisable for U.S.-Iranian dual nationals to obtain in their Iranian passports the necessary visas for the country which they will transit upon their return to the U.S., so that if their U.S. passports are confiscated, they may apply for a new U.S. passport in that country.

14

*See* U.S. Department of State, Bureau of Consular Affairs, *Consular Information Sheet - Iran* (December 21, 2004), *available at* http:/travel.state.gov/travel/cis_pa_tw/cis/cis_1142.html (attached as Exhibit B to Defendant Hosseini's Motion to Reconsider Release on Bail). This is persuasive evidence that a dual national's possession of two valid passports is neither extraordinary, nor unacceptable. And based upon the information contained in these documents, the Court finds that Mr. Hosseini's possession of both a valid Iranian passport and a valid U.S. passport was benign and even prudent, and not, as initially suggested by the government, a reflection of criminal intent or activity.

In addition to the evidence about Mr. Hosseini's possession of the two passports, at the detention hearing the government also argued that the stamps reflected in those passports showed that Mr. Hosseini made as many as 40 or 50 trips to Iran and to other foreign countries during the period from about 1998 to 2005. Based upon that evidence, the government then argued that the sheer volume of trips abroad was strong evidence, not only of Mr. Hosseini's involvement in the crimes alleged in the complaint, but of the likelihood that he would flee the country. And the Court accepted those points.

At the hearing on June 14, Mr. Hosseini argued that the government had grossly exaggerated his travel history. According

to Mr. Hosseini, the stamps on his passports indicate that he traveled to Iran roughly twice a year (sixteen times in the period from 1998 to 2005) – hardly enough to constitute suspicious behavior, especially given that members of his immediate family live there. He also argues that, to the extent his passport shows stamps to countries other than Iran, that should not be surprising, given that one cannot travel to Iran directly from the United States; rather, any trip to Iran necessarily involves a trip to at least one other country as well. Again, Mr. Hosseini points out, there is nothing sinister, nefarious or illegal about a travel history such as the one documented in his passports.

The government concedes that travel to Iran would require travel to another foreign country, but it argues that this information is nonetheless immaterial because the Court never found that Mr. Hosseini made that many trips abroad. Although the government may have talked about a lesser number of trips at the detention hearing on March 25th, the initial detention order indicates that Mr. Hosseini traveled to Iran twenty-nine times during the pendency of the racketeering conspiracy, and, based upon the new information provided by Mr. Hosseini, that finding is not supported by the passport stamps. More importantly, even if the actual number of trips remained the same, the lens through which the Court views those trips is unquestionably affected by

the information put forth by Mr. Hosseini.  Certainly, the information undercuts the government's argument that the sheer volume of travel and the number of countries visited demonstrates criminal activity or risk of flight.

The Court is, in no way, suggesting that the government deliberately misled it concerning how it should assess the evidence about the two passports and the stamps in those passports.  In fact, the Court has every reason to think that the government (like the Court) was simply ignorant about the pertinent issues.  But that does not change this fact:  the Court's determination that Mr. Hosseini was a flight risk who needed to be detained was based, at least in part, upon faulty and erroneous assumptions and, as such, must at least be revisited.

On balance, although the government has presented strong evidence that Mr. Hosseini should be held to answer for the offense charged in the complaint, the Court is nonetheless persuaded, given Mr. Hosseini's lack of any criminal record, his strong ties to his family here and to his Winnetka community, the fact that he has resided in this country for more than 25 years and been a citizen of this country for almost ten years, as well as all of the other factors discussed above, that a combination of conditions exists that will reasonably assure Mr. Hosseini's appearance as required.

The government has cited several cases in support of its contention that no condition or combination of conditions will reasonably assure Mr. Hosseini's appearance as required, *see, e.g., United States v. Cervantes*, 951 F.2d 859 (7th Cir. 1992); *United States v. Jamal*, 326 F.Supp.2d 1006 (D. Ariz. 2003). But those cases actually support the Court's conclusion today.

For example, in *Cervantes*, the Seventh Circuit held that detention was appropriate because the defendant had been indicted for selling cocaine, which gave rise to a presumption that his release would threaten the safety of his community, and because the defendant had taken great pains to mislead authorities and to maintain two identities, both of which "ha[ve] trouble qualifying for release before trial." *Cervantes*, 951 F.2d at 861. The court noted that the person he first claimed to be "has no assets or family in the United States and no reason to remain here if released," and that the person he next claimed to be "did not appear to serve an earlier prison term, obtained a green card improperly, is a fugitive from an IRS warrant for his arrest and deportation, and illegally purchased a shotgun under an assumed name." *Id.*

Neither of the defendant's identities in *Cervantes* shares any traits with Mr. Hosseini. Unlike the first Cervantes' identity, Mr. Hosseini has substantial assets and significant family and community ties in the United States; and unlike

18

Cervantes' other identity, Mr. Hosseini has no criminal history, he legitimately obtained citizenship in this country, he holds no false identification or citizenship documents, and he has no history of attempting to evade the law; on the contrary, as Mr. Hosseini has repeatedly pointed out, he knew he was being investigated, yet he repeatedly elected to return from his trips abroad.

The defendant in *Jamal*, like Mr. Hosseini, maintained dual nationality at the time of his arrest (though with Lebanon, not Iran), he was charged with offenses other than those described in §3142(e), and he faced a lengthy prison term if convicted as charged. *See Jamal*, 326 F.Supp.2d at 1007-08. And the court ordered detention, even after it acknowledged that "pretrial detention was intended for unusual cases, and that such detention is to be imposed only where 'no condition or combination of conditions will reasonably assure the appearance' of the person required." *Id.* at 1009-10. It did so because it concluded that this was an unusual case in that:

Jamal was accused of being the leader of a large interstate conspiracy involving theft and money laundering (so far, not too terribly different from Mr. Hosseini);

Jamal had relatively few assets in the United States and more substantial assets in Lebanon (the same is not true of Mr. Hosseini; in the worst light, his assets are evenly divided

19

between his two countries of citizenship);

Jamal had made plans and preparations to return to Lebanon, and even to run for political office there (there is nothing in the record to suggest that Mr. Hosseini ever intended to build a life in Iran);

although Jamal had family in the United States, they had lived for a time without him in Lebanon, thereby demonstrating a willingness to live in the other country (there is nothing in the record to suggest that Mr. Hosseini's family has ever lived anywhere but here or that they are at all willing to live in Iran); and

Jamal, if convicted, faced imprisonment, denaturalization and deportation (there is no indication that Mr. Hosseini could face the latter two, even if convicted). *See id.* at 1009.

But the most shocking evidence – the evidence that no doubt pushed the court over the edge on the detention issue - was that only a month before his arrest, Jamal had openly declared his willingness to abandon his U.S. assets and flee to Lebanon to avoid prosecution in another matter. *Id.* at 1009-10. It is hard to imagine that there could be stronger evidence that the person before the court was a flight risk who should be detained. But there is no parallel evidence in this case. Unlike *Jamal*, there is nothing in the record to persuade the Court that this is the "unusual case," a case so extraordinary or egregious that the

drastic measure of pretrial detention should be employed.

A couple of additional points must be addressed. First, the Court acknowledges that, in addition to the arguments discussed above, Mr. Hosseini has argued that detention, even at the MCC, will make it difficult, if not impossible, for him to obtain effective assistance of counsel in the preparation of his defense, given the restrictions on visitation there and the complex and document-intensive nature of this case. He has also argued that his diabetes makes detention almost unbearable, and he has described how he has suffered while confined. The Court is not unsympathetic to these arguments. And they do tend to bolster, if only slightly, the Court's decision today, in that they bear on Mr. Hosseini's physical and mental condition. *See* 18 U.S.C. §3142(e)(3).

Also tending to buttress the Court's decision to reconsider the detention issue in this case is the fact that the government has requested, and obtained, a ninety-day extension of the period in which it is required to return an indictment. In light of this, unless the Court reconsiders its earlier ruling, a man charged only with racketeering, who has been a citizen of the United States for almost a decade, and a resident of this country for a quarter of a century, with no criminal history and substantial ties to his community, would have to spend more than

four months in prison before he is even indicted.[5] Based upon the factors examined above, the Court agrees with Mr. Hosseini that this outcome is, under the statute, neither warranted, nor appropriate.

## Conclusion

For the reasons explained above, the Court grants Mr. Hosseini's Motion to Reconsider Release on Bail, and orders Mr. Hosseini released under the following conditions: (1) Mr. Hosseini shall post a $1 million bond secured by the equity in no fewer than three pieces of property, none of which are owned, in whole or in part, by him; (2) Mr. Hosseini shall be confined to his home, under electronic monitoring, and he is permitted to leave his home only for court appearances, meetings with his attorney in connection with this matter, his own medical appointments, and religious services; (3) Mr. Hosseini shall surrender any and all passports he holds and agree not to obtain any other passports, and his wife and his children shall do the same; and (4) Mr. Hosseini's wife shall agree to serve as the Third Party Custodian for her husband.

---

[5]The Court is unwilling to continue to deprive Mr. Hosseini of his freedom while the government continues to investigate and to decide whether more serious, drug-related charges should be filed.

Under these conditions, Mr. Hosseini shall be released from the custody of the U.S. Marshal's Service.

Dated: June 23, 2005          E N T E R:

ARLANDER KEYS
United States Magistrate Judge